626 So.2d 800 (1993)
STATE of Louisiana, Plaintiff-Appellee,
v.
Curtis Ray DAVIS, Defendant-Appellant.
No. 25183-KA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1993.
*802 Neil Dixon, Shreveport, for defendant-appellant.
Richard Ieyoub, Atty. Gen., Paul J. Carmouche, Dist. Atty., James Burke and Catherine M. Estopinal, Asst. Dist. Attys., Shreveport, for plaintiff-appellee.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
NORRIS, Judge.
Curtis Ray Davis was indicted for the second degree murder of Roderick Washington. He proceeded to a jury trial after which he was found guilty as charged. He now appeals, advancing eight assignments of error. For the reasons expressed, we affirm.

Factual background
Around 10:00 on the evening of July 28, 1990, residents of the Grimmett Drive Apartments in Shreveport heard an argument in the breezeway adjacent to the "400" building in the complex. After hearing one or two gunshots, Betty Smith looked out her apartment door and saw three men standing in the breezeway. She did not recognize any of them, but saw that one was holding a baby. The first man was demanding of the second man, the one holding the baby: "Give me the keys." The second man protested, "Man, I don't know you," and eventually begged, "Don't shoot me." He backed up against a wall and shielded the baby, which was screaming, from the first man, who had a gun. Ms. Smith walked up, and the second man begged for someone to "please get the baby." Ms. Smith took the baby, but looked at the assailant and shouted, "Please, don't shoot him." She testified she talked to him "as though he was my own child." She took the baby and brought him back to her apartment. When she looked again, she saw the men tussling. She heard a shot, saw a pistol land on the ground, and saw the first man run off. The second man, Roderick Washington, fell to the ground, partly slumped against the wall. Paramedics arrived but could not revive him.
Shortly after the incident, officers showed Ms. Smith a photo lineup. Ms. Smith tentatively identified the defendant, Curtis Ray Davis. At trial she positively identified him, explaining she was unsure earlier because the assailant was wearing a baseball cap pulled down on his head. Now, however, she was certain that Davis was the assailant. She admitted that she did not actually see the gun in his hand when the fatal shot was discharged. However, she had seen him waving the gun when she walked up to get the baby, and saw it fall to the pavement right after she heard the shot.
Three other witnesses, Donald Berryman, Gwendolyn Hodge and Kevin Humphrey, saw the incident from a distance. Although they could not see who actually fired the gun, they largely corroborated Ms. Smith's account. Berryman verified that a woman (Ms. Smith) came around the corner toward the arguing men and told them, "You all quit that." Humphrey testified that he saw one of the men "pointing something" at another. Ms. Hodge felt from the outset that this was a "negative commotion," and since she was assistant manager of the apartments she rushed to her phone and dialed 911 after she heard several shots.
Dr. McCormick, the coroner, testified that Washington died of a large caliber bullet wound in the left side of his abdomen, but also found a laceration on the victim's left foot, consistent with a gunshot wound. Richard Beighley, a criminologist with the North Louisiana Crime Lab, examined the gun taken *803 from the scene and the bullet taken from Washington's body. He could not positively say that the bullet was fired from the gun, but testified that it shared many of the gun's characteristics.
As noted, the jury found Davis guilty as charged, by a vote of 10-2. Six of his assignments of error challenge how the jury was selected, one challenges an evidentiary ruling of the trial court, and one urges the evidence was insufficient to convict.

Discussion: Assignments Nos. 2 and 3
By his second assignment Davis urges the trial court erred in denying his motion to quash the jury panel filed on March 17, 1992. By his third assignment he urges the trial court erred in denying the portions of his motion for new trial and motion in arrest of judgment that pertained to the improper selection of the petit jury venire, thus depriving Davis of the right to be tried by a jury of his peers.
The trial court had denied some portions of the motion for new trial and motion in arrest of judgment in open court on August 24, 1992. The remaining arguments were dismissed by written reasons of December 15, 1992.
At the hearing on these motions Davis introduced in evidence a document containing the ratio of black and white registered voters in Caddo Parish from 1971 to 1991. On the average during that period, 67.10% of registered voters were white and 32.10% black. However, an excerpt from the 1990 Census of Population showed that the overall population of Caddo Parish in 1990 was 59.04% white and 40.08% black. Curtis Warren, the Clerk of Court of the First Judicial District, described the mechanics of selection of the Caddo Parish jury panel. Jury venires are randomly selected by computer from names drawn from a list of registered voters in the parish. R. pp. 908-932. The jury that heard Davis's case was 83.33% white and 16.67% black.
Davis now argues that whites exceed blacks by population by only 18.96%, while white voters exceed black voters by 35%. This difference, he argues, inevitably results in diluting the possibility of a black defendant in Caddo Parish being tried before a representative panel. More generally he contends that the use of voter rolls results in an impermissible dilution of the right of a black defendant to be tried by a jury of his peers. We note, however, that the census figures do not show what portion of the black or white population meets the age requirement for serving on a jury, La.C.Cr.P. art. 401A(2). Voter rolls obviously comply with this criterion.
A motion to quash the venire will not be granted unless there is fraud in the selection, some great wrong has been practiced which will work an irreparable harm on the defendant, or there is a systematic exclusion of otherwise qualified persons solely on the basis of race. La.C.Cr.P. art. 419 A; State v. Lee, 559 So.2d 1310 (La.1990), cert. denied 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). Davis's argument is obviously based on an alleged systematic exclusion of blacks. He bears a heavy burden of establishing grounds to quash the venire. Id., at 1313. A showing of mere underrepresentation of blacks on the venire will not suffice. State v. Anderson, 315 So.2d 266 (La.1975); State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir. 1991), writ denied 594 So.2d 1317 (La.1992); State v. Matthews, 552 So.2d 590 (La.App. 2d Cir.1989), writ denied 559 So.2d 137 (La. 1990).
This court analyzed the First Judicial District's process for drawing petit jury venires in great detail in the recent case of State v. Rose, 606 So.2d 845, 851-852 (La.App. 2d Cir.1992). The substance of Mr. Warren's testimony in the instant case is identical to that offered in Rose. The use of voter registration rolls to draw jury venires has long been approved by the courts and is constitutionally acceptable unless the defendant demonstrates that the practice discriminates against certain classes of people resulting in a nonrepresentative cross section of the community. See State v. Brogdon, 426 So.2d 158 (La.1983), cert. denied 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Loyd, 489 So.2d 898 (La.1986), cert. denied 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987). In this case Davis has shown mere *804 underrepresentation; as in Rose, he has not demonstrated that voter rolls suppressed black representation. The use of a computer to select a venire randomly has also been approved. State v. Sheppard, 350 So.2d 615 (La.1977); State v. Melancon, 563 So.2d 913 (La.App. 3d Cir.1990), writ denied 586 So.2d 527 (La.1991). The computer made selections from the voter rolls without regard to race. In sum, the state has shown a random, non-discriminatory method of drawing petit jury venires. State v. Rose, 606 So.2d at 852. Davis has failed to show that the venire should be quashed because "persons were systematically excluded from the venires solely upon the basis of race." C.Cr.P. art. 419A.
These assignments lack merit.

Assignment No. 4
By this assignment Davis urges the trial court erred in denying the portions of his motion for new trial and motion in arrest of judgment that alleged racial imbalance in the selection of grand jury foremen.
In brief Davis argues that the statistical evidence from records of the Registrar of Voters shows that between 1971 and 1991, 86.7% of grand jury foremen were white and 13.3% black. He contends that this establishes a pattern of discrimination that violates equal protection, citing Johnson v. Puckett, 929 F.2d 1067 (5th Cir.1991), and Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).
This court recently analyzed Caddo Parish's procedure for selecting jury foremen in State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied 617 So.2d 905 (La. 1993). We found that while the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment, the defendant did not prove "the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve as forepersons over a significant period of time." Id., at 1081. We noted that "one alleging discrimination may not prove his case by simply expanding the subject period of time until his position finds sufficient support." We found that for a significant period of time, from 1979 to 1991, the discrepancy between the percentage of black voters and black grand jury foremen in Caddo Parish was negligible. Id. Davis's effort to expand the subject period from that used in Thomas is not persuasive and does not prove a discriminatory practice in the instant case.
This assignment lacks merit.

Assignment No. 1
By this assignment Davis urges the trial court erred in failing to sustain his objection to the state's improper use of peremptory challenges; and in denying the portions of his motion for new trial and motion in arrest of judgment that contested the state's use of peremptory challenges. The thrust of the argument is that the state used its peremptory challenges to excuse black persons from the jury. According to Davis, the reasons advanced by the prosecutor, unemployment and criminal convictions, were not consistently applied to all jurors.
A peremptory challenge by the state shall not be based solely on the basis of the race of the juror. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); La.C.Cr.P. art. 795. In order to preserve the complaint that the prosecutor's use of a peremptory challenge was based on race, the defense must make an objection before the entire jury panel is sworn. State v. Williams, 524 So.2d 746 (La.1988); State v. White, 535 So.2d 929 (La.App. 2d Cir. 1988), writ denied 537 So.2d 1161 (La.1989).
To establish a prima facie case under Batson, the defendant must show that he is a member of a cognizable racial group and that the state has exercised peremptory challenges to remove members of his race from the petit jury. All relevant circumstances may be considered to determine whether the defendant has made the requisite showing. State v. Thompson, 516 So.2d 349 (La.1987), cert. denied 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Once the defendant makes this showing, the burden shifts to the state "to come forward with a neutral explanation for challenging black jurors." Batson, 476 U.S. at 97, 106 S.Ct. at *805 1723. A prosecutor may not rebut the defendant's prima facie case by merely stating that a potential juror would be partial to the defendant because of their shared race. On the other hand, the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." Id. Ultimately, the burden of persuasion is on the defendant. State v. Thompson, 516 So.2d at 354.
In the instant case the state exercised peremptory challenges against four black prospective jurors. It accepted two others. The trial court did not rule on whether Davis had made a prima facie showing under Batson; however, the court allowed the district attorney to set forth reasons for the challenges.
The state excused Ms. Payne, Ms. Brown, Mr. Mosley and Ms. Owens by peremptory challenge. The prosecutor stated that he excused Ms. Payne because of "some hesitancy on her part regarding application of the law" and "the impartiality that she may have in this case"; also, she knew defense co-counsel. R. p. 601. He stated that he excused Ms. Brown because "she has not been employed for over a year" and "her brother is presently serving time in jail for what she believes is distribution of drugs." R. p. 604. He excused Mr. Mosely because of concern over his "uncertain employment" and a brother who was arrested on a burglary charge. R. p. 601. The prosecutor excused Ms. Owens because she "has not worked in over five years" and because a family member "has been arrested and convicted of attempted murder and presently serving 30 years in jail for that charge." R. p. 603. A review of the voir dire examination verifies each of these explanations. R. pp. 323-324, 354, 369 (Ms. Payne); 571-572 (Ms. Brown); 307-308 (Mr. Mosley); 378-379 (Ms. Owens).
Davis adds that the state did not excuse two other jurors who were allegedly unemployed, Rae P. Hardy, a white woman, and Richard Chambers, a black man. We do not accept Davis's characterization of Ms. Hardy as unemployed; she testified she is a housewife. R. p. 565. Neither she nor Mr. Chambers had a relative in jail.
Each of the state's peremptory challenges was based on legitimate, race-neutral reasons. Ms. Payne showed unwillingness to apply the law as instructed; this is a neutral ground to exclude her. State v. Collier, 553 So.2d 815, 820 (La.1989); State v. Lindsey, 543 So.2d 886, 898 (La.1989), cert. denied 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). The other prospective jurors' connections with other criminal prosecutions were also sufficient for the exercise of a peremptory challenge. United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir.1987); State v. Mims, 524 So.2d 526, 548 (La.App. 2d Cir.), writ denied 531 So.2d 267 (La. 1988).[1] Unemployment has also been considered a race-neutral factor. Collier, 553 So.2d at 821. Further, the state's failure to excuse Ms. Hardy and Mr. Chambers does not strike us as disparate treatment; she was not unemployed and he had no relatives in jail.
In sum, the state provided adequate, racially neutral reasons for its use of peremptory challenges. This assignment lacks merit.

Assignment No. 5
By this assignment Davis urges the trial court erred in allowing the state on voir dire to furnish each prospective juror written statements of the state's version of applicable law. At voir dire, the prosecutor passed out a booklet to the prospective jurors outlining the charges of second degree murder, armed robbery, simple robbery, manslaughter and the law of principals. Davis objected, urging to the trial court and on appeal that this is prohibited by La.C.Cr.P. art. 793, which provides in part:
A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence.
Davis argues that there is no difference between what occurred at voir dire and art. 793's prohibition against using written notes.
We do not agree. Article 793 plainly applies only to jury deliberations at trial. By its own terms, it does not extend to the *806 examination of prospective jurors, which is regulated by La.C.Cr.P. art. 786. Here, the booklets were prepared in advance, given to the venire members during examination and collected before the jurors were sworn. The jurors did not have access to the booklets during deliberations. Moreover, there is no allegation that the booklets contained erroneous statements of law, influenced the jury or prejudiced Davis in any way.
This assignment lacks merit.

Assignment No. 8
By this assignment Davis urges the trial court erred in granting the state's challenge for cause of a prospective juror, Mr. Wright. On voir dire, Wright stated that he had been beaten during an arrest by the Shreveport Police Department. Asked if he could be fair and impartial, he first said, "probably not," and then clarified, "well, a flat no." R. pp. 509-513. Later, however, he stated that he could vote his conscience if the evidence pointed to acquittal or conviction. R. p. 548.
The state or the defendant may challenge a juror for cause on the ground that the juror is not impartial, whatever the cause of his partiality. La.C.Cr.P. art. 797(2). A prospective juror's statement that he will be fair and impartial is not binding on the trial court. If the examination discloses facts from which bias or prejudice may be reasonably inferred, the juror may be excused for cause. State v. Lewis, 391 So.2d 1156 (La.1980); State v. Monroe, 366 So.2d 1345 (La.1978), cert. denied 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983). The trial court has great discretion in ruling on a challenge for cause; the ruling will be reversed only if there is an abuse of discretion. State v. Albert, 414 So.2d 680 (La.1982); State v. Widenhouse, 582 So.2d 1374 (La. App. 2d Cir.), writ denied 586 So.2d 567 (1991), cert. denied ___ U.S. ___, 112 S.Ct. 1274, 117 L.Ed.2d 500 (1992).
Mr. Wright described an incident in which a Shreveport Police officer hit him with a club across his jaw, loosening his back teeth and splitting some stitches open. This occurred two weeks after he had been arrested for DWI. R. pp. 511-512. Even from the impassive record we can read a level of hostility toward law enforcement in Mr. Wright's attitude which is not effectively dispelled by his later statement that he understood the law as given. R. p. 517. We perceive no abuse of the trial court's discretion in excusing Mr. Wright.
This assignment lacks merit.

Assignment No. 6
By this assignment Davis urges the trial court erred in allowing Officer G.B. Foster to recite, in an effort to rehabilitate Ms. Smith, the state's lead witness, Officer Foster's recollection of Ms. Smith's prior statement to him, all after Ms. Smith had been impeached by prior inconsistent statements.
According to Davis, the only evidence in the case to connect him with the shooting is Ms. Smith's testimony, which is not credible. Restated briefly, she testified that she heard some shots near her apartment and went outside. She saw an armed man confronting Washington, who was holding a child. Ms. Smith got a good look at the assailant, and then picked up the child and took it into her apartment. When she came back outside, she saw the man and Washington struggling for the gun. The gun went off, Washington slumped down and the gun fell to the ground.
Counsel attempted to impeach Ms. Smith on cross by asking her what she had previously told Officer Foster on the night of the shooting. She recalled telling him she saw the shooting, but not telling him the identity of the assailant because she did not know who he was at the time. She denied telling Foster she was indoors when the fatal shot was fired or that when she came back outside the only thing she saw was Washington lying down with a gun at his side. R. pp. 713-715.
The defense also called Officer Foster in an effort to impeach Ms. Smith. He testified that she told him she had retrieved the child, heard some more shots, returned outside and found the victim lying back outside the door. R. pp. 836-838. On cross examination, Officer Foster related that the circumstances under which he took Ms. Smith's statement *807 were very unfavorable: she was highly excited, talked very fast, and was frequently interrupted by phone calls. The prosecutor then asked Officer Foster to relate everything Ms. Smith had told him that night. Davis objected, urging that to introduce anything beyond the prior inconsistent portion of Ms. Smith's statement was improper rehabilitation. R. p. 839. The objection was overruled, and Davis now argues on appeal that La.C.E. art. 607 does not sanction this sort of rehabilitation of the witness.
We do not agree. Article 607D(2) permits the admission of a prior inconsistent statement when it is used solely to attack the credibility of a witness. By this article, Davis was entitled to call Officer Foster to adduce Ms. Smith's allegedly inconsistent prior statement to him. However, the article does not in any way prohibit the other side from rehabilitating the witness.
On the contrary, the Code of Evidence provides for the kind of evidence at issue here by defining it as non-hearsay:
Art. 801. Definitions
* * * * * *
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statements by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: * * *
(b) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]
Ms. Smith testified at trial and was subject to cross examination. Her prior statement to Officer Foster, in light of the trying circumstances in which it was taken, was largely consistent with her trial testimony. It was adduced to counter the charge that it was actually inconsistent with her trial testimony.
The prior statement was obviously relevant to counter the charge she changed her account between the night of the shooting and the day of trial, and was admissible. La. C.Ev. arts. 401, 402; see also State v. Knapper, 458 So.2d 1284 (La.1984),[2] and State v. Martin, 356 So.2d 1370 (La.1978). Moreover, the jury had already heard Ms. Smith's account once when she testified and again, in less detail, when Officer Foster testified for the state; any potential error in allowing him to testify as he did here was harmless beyond any doubt.[3]
This assignment lacks merit.

Assignment No. 7
By this assignment Davis urges the trial court erred in denying his motion for post verdict judgment of acquittal, which contested the sufficiency of the evidence. The test of sufficiency on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). There is no allegation that any element of the charged offense, second degree murder, was unproved in this case; the only issue is the identity of the perpetrator. The thrust of Davis's argument is that there is no evidence, besides the testimony of Ms. Smith, to connect him with the crime, and Ms. Smith's testimony is unworthy of belief.
In the first place, we do not agree that there is no evidence, aside from Ms. Smith's testimony, linking Davis to the crime. The testimony of Kevin Humphrey, Gwendolyn Hodge and Donald Berryman, summarized above, essentially corroborated Ms. Smith's. Notably, Humphrey described the assailant as a short black male, R. p. 802. This answers Ms. Smith's description of Davis as a "clean cut little fellow" reasonably well, given Humphrey's inferior vantage point. R. p. 690.
Even so, the crux of the state's case was Ms. Smith's identification. She described the assailant as short, with a clean haircut and *808 large lips; she positively identified Davis as the perpetrator. Her second pre-trial photo lineup was also positive, although her first one was tentative. Admittedly, her initial statement to Officer Foster may not have been as complete as her trial testimony. However, it is very clear that Officer Foster took that statement under chaotic circumstances. R. p. 838. This easily could have prevented him from getting every detail. Ms. Smith's account of the aggressor's other conduct at the scenedemanding Washington's keys despite his protests, brandishing a gun at him, fleeing after the shot was fired did not change at all from the date of the offense to the date of trial.
Credibility assessments are fundamentally the jury's province. State v. Trosclair, 443 So.2d 1098 (La.1983). The jury has great discretion in deciding whether to believe or reject a witness's testimony. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied 567 So.2d 93 (La.1990). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support the factual conclusion. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (La.1992); State v. Garlepied, 454 So.2d 1147 (La.App. 4th Cir.), writ denied 462 So.2d 189 (La.1984). We cannot say that on the evidence presented the jury abused its discretion by accepting Ms. Smith's testimony that named Davis as the perpetrator of this offense.
This assignment lacks merit.

Conclusion
Finally, we have reviewed the entire record and find nothing we consider to be error patent. For the reasons expressed, the conviction and sentence of Curtis Ray Davis are affirmed.
AFFIRMED.
NOTES
[1] Sentence vacated on other grounds, 550 So.2d 760 (La.App. 2d Cir.1989); aff'd on remand, 566 So.2d 661 (La.App. 2d Cir.), writ denied 569 So.2d 970 (La.1990).
[2] Post conviction relief granted on other grounds, 579 So.2d 956 (1991).
[3] The author's notes to art. 801 state that the prior consistent statement is admissible not only to corroborate the witness's testimony but as substantive evidence.