WILLIAMS, J.
_JjThe defendant, Carlton James Church, was charged by amended bill of information with manslaughter, a violation of LSA-R.S. 14:31. After a jury trial, the defendant was found guilty as charged. The district court sentenced the defendant to serve 30 years’ imprisonment at hard labor. Defendant appeals his conviction and sentence. For the following reasons, we affirm.
FACTS
On February 24, 2009, Robert Hall, III, was working as a porter at the Chevyland auto dealership in Shreveport. Hall was a 31-year-old, slightly built man, who was 5 feet, 1 inch tall and weighed 125 pounds. Hall, who was also known as “Little Robert,” had the habit of touching people, or *1221 leaning on them, as a greeting and in conversation. This behavior could sometimes get on his coworkers’ nerves. The defendant, who is 6 feet, 2 inches tall and weighs 225 pounds, was employed at Chevyland as a supervising mechanic.
During that afternoon, Hall was walking through one of the bay doors at the rear of the service area and saw the defendant, his coworker, standing just outside the building smoking a cigarette. As was his habit, Hall patted defendant on the back as he walked past. Without saying anything, the defendant turned and punched Hall in the head. Hall, unconscious, fell backwards and struck the back of his head against the concrete pavement. The defendant, who was walking away, noticed that Hall was still on the ground. Defendant went over to Hall and yelled for someone to call 911.
At the time, another porter, Maurice Neal, was standing with his | acoworker, Eric Williams, in the shop. Neal had seen the defendant walking toward the smoking area and mentioned to Williams that the defendant appeared to be angry. About two minutes later, Neal saw Hall going past the smoking area. Neal later told police that as Hall walked through the bay door he touched defendant on the shoulder and that defendant then turned and “nailed him.” Dexter Caldwell, a detailer at Chevyland, testified at trial that he saw Hall fall to the ground:
I was coming around the corner of the car wash, and as soon as I hit that corner, I[saw] Robert falling to the ground.... And when he was falling, he was like already out because he didn’t even try to catch himself. His head just hit the ground. So I did see his head hit that ground.
[[Image here]]
As my attention went to Jim, I seen he had his — like his lip bit and he had his fists balled up, and he kind of walked away from him, and then.... after he realized Robert wasn’t getting up off the ground, that’s when he came baek[.]
Neal called 911 and told the operator that “we’ve got a guy on the ground.” Neal said that he told the operator that he didn’t know what happened to Hall because “I wanted to leave it up to the managers” and because “I liked Jim and Robert ... and I didn’t want nothing to happen.”
Paramedics arrived and treated Hall, but defendant did not tell them what had occurred. One female employee told the paramedics that Hall had been elbowed in the face. However, when Hall began vomiting, the paramedics thought Hall might have a concussion and decided to transport him to a local hospital. Hall had an injury to the back of his head where it struck the concrete floor of the shop. Hall received treatment at the hospital, but CT scans showed increased brain swelling during the next | -¡several days from the head injury. The pressure from the swelling cut off the blood flow to a portion of his brain, causing Hall to fall into a coma. Hall died on March 3, 2009, after being removed from life support. The doctor who performed the autopsy opined that the brain injury was due to the impact of Hall’s head upon the concrete.
The day after the incident, the defendant spoke with Clary Lunday, who was in charge of the service and parts departments at Chevyland. Lunday recorded this interview on his cell phone. Defendant stated that he had been upset the previous day because the water at his rental home had been cut off due to the homeowner’s unpaid bill. The defendant said that he went to the back of the service area to smoke and as he stood there, “I get elbowed in the back ... turned around and hit that little f* * *er before I knew *1222 what I did[.] I spun around and hit him and I hit him hard.”
On March 5, 2009, Detective Eric Far-quhar of the Shreveport Police Department interviewed the defendant, who was accompanied by an attorney. The defendant told the detective that he was upset on the day of this incident not only because of the water bill, but for reasons he did not mention to Lunday, including his ex-wife’s demand for increased child support and a delay of his income tax refund. Defendant said that he decided to go smoke and calm down because he was upset. Defendant explained as follows:
I am sitting there smoking my cigarette ... whenever someone, I don’t know who at this time, walked up behind me and elbowed me in the back, and it was not knock you down elbowed, but it was forcible enough that it made me take a step forward, okay? Now I take a step forward as I caught myself, I immediately turned and swung. I was startled.
[¿Following this interview, defendant was arrested for manslaughter.
Subsequently, the jury found the defendant guilty of manslaughter. The defendant’s motions for new trial and for post-verdict judgment of acquittal were denied. After a lengthy sentencing hearing, the trial court sentenced defendant to serve 30 years at hard labor and denied his motion to reconsider sentence. This appeal followed.
DISCUSSION
The defendant contends the evidence was insufficient to support the conviction of manslaughter. Defendant argues that the evidence did not prove guilt beyond a reasonable doubt because the state failed to show that he intentionally used force against the victim.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/5/03), 852 So.2d 1020.
It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir.), writ denied, 532 So.2d 148 (La.1988). The trier of [¡¡fact hears the testimony first hand and unless the fact finder’s assessment of believability is without any rational basis it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Combs, 600 So.2d 751 (La.App. 2d Cir.), writ denied, 604 So.2d 973 (La.1992). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a fact finder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its *1223 sufficiency. State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
Manslaughter is a homicide committed without any intent to cause death or great bodily harm when the offender is engaged in the perpetration of any intentional misdemeanor directly affecting the person. LSA-R.S. |fi14:31(A)(2)(a). Battery is an intentional misdemeanor directly affecting the person. State v. Humphrey, 412 So.2d 507 (La.1981). Battery is defined as the intentional use of force or violence upon the person of another. LSA-R.S. 14:33. Battery is a general intent crime. LSA-R.S. 14:11. General criminal intent is present whenever there is specific intent and when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences of his act. LSA-R.S. 14:10.
In the present case, Maurice Neal testified that on the date of the incident, he was standing at the back of the service area when he saw the defendant walk to the smoking area. Neal mentioned to another worker that defendant seemed angry. Neal testified that several minutes later he saw Hall, as he had done many times, touch the defendant’s shoulder as he walked past and that defendant then turned around, looked at Hall and punched him with a closed fist. The testimony of Neal and Dexter Caldwell indicated that defendant hit Hall with enough force to knock him unconscious before his head hit the ground.
In his appellate brief, the defendant alleges that he is not culpable because he acted reflexively in hitting Hall. To support his argument, the defendant cites Neal’s testimony on cross-examination regarding his statement to Lunday that defendant had hit Hall with a “roundhouse” punch:
Q: And you told him that Robert walked behind Jim and tapped him on the back of the shoulder and then Jim turned around with a full roundhouse hit?
A: Yeah, I think I did tell Lunday that. [ ?Q: Okay.
A: I can’t remember — it was a while.
Q: And you said that he immediately turned and hit. Isn’t that what you told Mr. Lunday?
A: Like I say, I probably told him and showed him the way it happened. I just can’t remember.
Based on the evidence presented, the difference between Neal’s description to Lunday of defendant’s punch as a roundhouse and Neal’s testimony at trial is not as great as suggested by the defendant. Lunday did not testify about what Neal told him. Neal testified that he probably told and showed Lunday what happened, but that he could not recall his words at trial. Further, and more importantly, Neal’s description of the punch either as a roundhouse in one instance, or as a direct punch at trial, does not undermine the evidence that the defendant’s act was deliberate and intentional rather than a reflex. Neal did not state, nor does the evidence show, that he ever told Lunday or any other person that the defendant had acted reflexively or involuntarily when he hit Hall.
*1224 After a careful review of the entire record, and in particular Neal’s testimony, we cannot say that the jury erred in accepting Neal’s version of events. The positions of Neal, Hall and defendant at the scene were made clear to the jury through various visual and computer-generated evidence introduced in conjunction with Neal’s testimony. The evidence shows that Neal had the opportunity to observe the actions of defendant and the victim during the commission of the crime. Further, the defendant was able to cross-examine Neal about his ability to view the incident that he described.
| ^Additionally, the jury could reasonably have found that the defendant’s statements that he was knocked forward by Hall’s contact and that he swung his arm without looking to hit the smaller Hall were not plausible, given the difference in physical stature between them. The testimony showed that defendant intentionally punched downward to hit the shorter victim.
The jury considered the evidence and weighed the credibility of the witnesses. Based upon this record, there is ample evidence to support the jury’s rational conclusion that the defendant acted deliberately when he hit Hall. Because the state proved all of the elements of manslaughter beyond a reasonable doubt, this assignment of error is without merit.

Sentencing

The defendant contends the trial court erred in imposing an excessive sentence. Defendant argues that the court abused its discretion in imposing a sentence that is grossly out of proportion to the severity of the crime and that a less harsh sentence should be imposed.
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence 1 ¡¡is the goal of Article 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with Article 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 2008-2341 (La.5/15/09), 8 So.3d 581.
Second, a sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, a sentence will not be set aside as excessive. State v. Black, 28,100 (La. *1225 App.2d Cir.2/28/96), 669 So.2d 667, writ denied, 96-0836 (La.9/20/96), 679 So.2d 430. The penalty for committing manslaughter is imprisonment at hard labor for not more than 40 years. LSA-R.S. 14:31(B).
In the present case, a number of witnesses testified at the sentencing Imhearing. The victim’s father, Robert Hall, Jr., spoke about the devastating impact on the family resulting from his son’s death. The victim had a younger brother who is mentally handicapped and who lives at Holy Angels in Shreveport. The victim was very close to his brother, whom he visited often, and he participated in family life with his parents as well. The victim was a dedicated employee who enjoyed interacting with his coworkers at Chevy-land. His father described Hall as a person who did not have a mean bone in his body, who was easygoing, thoughtful and a good-natured young man. Hall’s father explained that his son’s death “destroyed a complete family.” He said that since the day his son died he has not been able to get more than three hours of sleep each night. He also said that the victim’s mother cried every night for months after her son’s death and that she was emotionally unable to speak at the sentencing hearing. Hall’s father stated that his mentally handicapped son had lost “his brother, his mentor, and most of all, his future guardian.” Robert Hall, Jr., asked the trial court to give the defendant the maximum sentence for the crime because the victim’s family would live with their loss for the rest of their lives.
The defendant produced a number of witnesses at the hearing, including his mother, his former wife and his 16-year old daughter, who all said that defendant was a very good father who cared for his children and others. However, this testimony was contradicted by the former wife’s statement that defendant owed $20,000 in past due child support. Although these witnesses and others testified that they knew defendant to be a peaceful person whom they had never seen angry, the testimony showed that |nmany of the witnesses did not have significant knowledge of defendant’s personality. Some witnesses had known defendant for only two or three years. One witness stated that in a seven-year period, he had seen defendant probably ten times for business reasons. Another witness, who described himself as defendant’s “best friend,” testified that he had known defendant for approximately 30 years, but had only seen defendant 15 to 20 times in the last ten years. Additionally, most of the witnesses were unfamiliar with the details of defendant’s crime and others said their knowledge was based on information from the defendant or the media.
The defendant testified that he did not graduate from high school and had worked as a mechanic. Defendant stated that he was divorced, that his four children were in the custody of their mother and that he was behind in paying child support. Defendant stated that he used profanity to refer to Hall when speaking to Lunday because he was upset. Defendant testified that he hit Hall because he was “startled,” even though he knew Hall’s habit of patting other workers on the back. Defendant acknowledged that he did not go to visit Hall in the hospital, that he did not attend his funeral and that he had never contacted Hall or his parents to offer an apology before the date of sentencing.
Prior to imposing sentence, the trial court considered the guidelines of Article 894.1, the evidence adduced at the jury trial, the testimony at the sentencing hearing, the letters submitted to the court on the defendant’s behalf and the statement of the victim’s father. The court noted *1226 defendant’s prior conviction for DWI and that he had expressed remorse. Based on |12these considerations, the trial court sentenced defendant to serve 30 years’ imprisonment.
Defendant argues that the sentence imposed is excessive, relying on the witness testimony describing him as a nice guy who helped others and never showed anger. However, their testimony supports a finding that many of the witnesses were not really that familiar with defendant. Some had known him for only a few years and had limited contact with him during that time. Even the defendant’s brother testified he had not seen defendant for one year. Further, most of the witnesses expressed surprise when they learned at the hearing that defendant had failed to apologize to Hall or his parents and had not visited Hall in the hospital or attended his funeral. Thus, we cannot say the trial court abused its sentencing discretion by according relatively little or no weight to the essentially subjective statements of belief by defendant’s witnesses.
In addition, contrary to defendant’s assertions in his appellate brief and motion to reconsider, the evidence presented shows that defendant did not act under strong provocation, there were no substantial grounds tending to excuse defendant’s criminal conduct and the victim did not induce defendant’s criminal act. These factors are not supported by the record and defendant’s apparent attempt to blame the victim to excuse his own criminal conduct is troubling. Defendant also seeks to avoid responsibility for his actions by asserting that the victim’s death was caused not by his punch, but by the manner in which the victim’s head hit the ground. Of course, the victim’s head smashed against the pavement only because the defendant | ^intentionally punched the victim without provocation. Regarding the applicable aggravating factors, the record shows that defendant knew the victim was particularly vulnerable due to his learning disability and diminutive size and that the offense caused significant permanent injury to the victim’s family.
The district court heard the evidence at trial and considered the sentencing guidelines. The record shows that the defendant’s criminal conduct resulted from circumstances that are likely to recur because he apparently continues to feel justified in taking out his anger on a physically smaller person who “startled” the defendant when he was having a bad day. Thus, the record supports the trial court’s findings that defendant is in need of correctional treatment that could be provided most effectively by his commitment to an institution and that a lesser sentence would deprecate the seriousness of the defendant’s crime. After reviewing the entire record, we cannot say that the 30-year sentence imposed is grossly out of proportion to the severity of defendant’s crime, which resulted in the death of the victim.
The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. White, 2010-1799 (La.7/1/11), 68 So.3d 508; State v. Williams, 46,674 (La.App.2d Cir.12/14/11), 81 So.3d 220. Based upon the circumstances of this case, where the defendant intentionally punched an innocent and defenseless victim who had sought only to greet his coworker before being senselessly attacked, the trial court did not abuse its discretion in imposing this 30-year sentence; although the term of imprisonment is at the upper end |14of the sentencing range for the offense of conviction, it does not shock the sense of justice. Thus, the sentence imposed is not constitutionally *1227 excessive. The assignment of error lacks merit.
We have examined the record for error patent and found none.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.
BROWN, Chief Judge, dissents with written reasons.